No. 15-50606

# In the United States Court of Appeals for the Fifth Circuit

———————————————

KATHY CLARK, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY
SITUATED; AMY ENDSLEY, ON BEHALF OF HERSELF AND ALL OTHERS
SIMILARLY SITUATED; SUSAN GRIMMETT, ON BEHALF OF HERSELF AND
ALL OTHERS SIMILARLY SITUATED; MARGUERIETTE SCHMOLL,
ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED;
KEVIN ULRICH, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY
SITUATED; ET AL.,
PLAINTIFFS-APPELLEES

*v.*

CENTENE COMPANY OF TEXAS, L.P.,
DEFENDANT-APPELLANT

———————————————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS (CIV. NO. 12-174)
(THE HONORABLE SAM SPARKS, J.)*

———————————————

**BRIEF OF APPELLANT CENTENE COMPANY OF TEXAS, L.P.**

———————————————

MICHAEL J. GOLDEN
BOULETTE GOLDEN & MARIN LLP
  *2801 Via Fortuna, Suite 530*
  *Austin, TX 78746*

KANNON K. SHANMUGAM
MATTHEW B. NICHOLSON
LESLIE C. MAHAFFEY
WILLIAMS & CONNOLLY LLP
  *725 Twelfth Street, N.W.*
  *Washington, DC 20005*
  *(202) 434-5000*

## CERTIFICATE OF INTERESTED PERSONS

I, Kannon K. Shanmugam, counsel for appellant Centene Company of Texas, L.P., and a member of the Bar of this Court, certify that the following listed persons and entities, as described in Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case:

A.     Parties and their affiliates:

Defendant-Appellant:          Centene Company of Texas, L.P.
                              Centene Corporation

Plaintiffs-Appellees:         Kathy Clark
                              Amy Endsley
                              Susan Grimmett
                              Margueriette Schmoll
                              Kevin Ulrich
                              Karen Calabrese
                              Rita Valdez
                              Timothy Centeno
                              Julia DeLeon
                              Emily English
                              Jill Galvan
                              Carolyn Garza
                              Sunshine Hartnagel
                              Yasira Hunter
                              Jose Longoria
                              Karen Moreno
                              Winston Pubien
                              Maricela Graciano-Ramos
                              Penny Riley
                              Anna Serratos
                              Laureen Sparrow
                              Jane Townsend

B.   Attorneys:

Defendant-Appellant:      Kannon K. Shanmugam
                          Matthew B. Nicholson
                          Leslie C. Mahaffey
                               *Williams & Connolly LLP*
                          Michael J. Golden
                               *Boulette Golden & Marin LLP*

Plaintiffs-Appellees:     Alexander M. Baggio
                          Adam W. Hansen
                          Rachhana T. Srey
                               *Nichols Kaster, PLLP*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Centene Company of Texas, L.P., respectfully submits that oral argument would be useful to the disposition of this appeal because the appeal presents important issues regarding the interpretation and application of the Fair Labor Standards Act.

# TABLE OF CONTENTS

Page

Statement of jurisdiction.............................................................................1

Statement of the issues .............................................................................1

Statement of the case ...............................................................................1

    A.    Statutory and regulatory background...........................................2

        1.    The administrative exemption...............................................5

        2.    The professional exemption...................................................8

    B.    Factual background .......................................................................9

    C.    Procedural history .......................................................................18

Summary of argument .............................................................................22

Standard of review....................................................................................26

Argument....................................................................................................27

    A.    Plaintiffs qualify for the administrative exemption from the
        FLSA's overtime requirement .......................................................28

        1.    Plaintiffs earned at least double the required amount
            per week..................................................................................28

        2.    Plaintiffs performed office or non-manual work directly
            related to the general business operations of Centene or
            its customer ...........................................................................29

            a.    Plaintiffs' work was directly related to the general
                business operations of Centene ...................................30

            b.    In the alternative, plaintiffs' work was directly
                related to the general business operations of
                Centene's customer .....................................................40

        3.    Plaintiffs' primary duty included the exercise of
            discretion and independent judgment with respect to
            matters of significance .........................................................44

Page

Table of contents—continued:

B.    In the alternative, plaintiffs qualify for the professional
    exemption from the FLSA's overtime requirement .....................51

    1.    Plaintiffs performed work requiring the use of advanced
        knowledge .................................................................................52

    2.    Plaintiffs' advanced knowledge was in a field of science
        or learning.................................................................................54

    3.    Plaintiffs' advanced knowledge was of a type
        customarily acquired by a prolonged course of
        specialized intellectual instruction.......................................55

Conclusion...................................................................................................58

## TABLE OF AUTHORITIES

### CASES

*Bricklayers, Masons & Plasterers Int'l Union of America, Local
    Union No. 15* v. *Stuart Plastering Co.*,
    512 F.2d 1017 (5th Cir. 1975).....................................................34, 47

*Brooklyn Savings Bank* v. *O'Neil*, 324 U.S. 697 (1945) ......................3

*Cheatham* v. *Allstate Insurance Co.*, 465 F.3d 578 (5th Cir. 2006).........*passim*

*Farmers Insurance Exchange, In re*, 481 F.3d 1119 (9th Cir. 2007) ........46, 50

*Foster* v. *Nationwide Mutual Insurance Co.*,
    710 F.3d 640 (6th Cir. 2013)..........................................33, 36, 37, 39

*Johnson* v. *WellPoint, Inc.*, Civ. No. 06-2430,
    2009 WL 8753325 (N.D. Ga. Mar. 30, 2009)..............................36, 39

*Lott* v. *Howard Wilson Chrysler-Plymouth*,
    203 F.3d 326 (5th Cir. 2000).............................................44, 45, 49

*McAllister* v. *Transamerica Occidental Life Insurance Co.*,
    325 F.3d 997 (8th Cir. 2003)................................................46, 47

Page

Cases—continued:

*Owsley* v. *San Antonio Independent School District*,
187 F.3d 521 (5th Cir. 1999)...........................................................26, 27, 55, 58

*Paul* v. *Petroleum Equipment Tools Co.*, 708 F.2d 168 (5th Cir. 1983)....55, 58

*Rieve* v. *Coventry Health Care, Inc.*,
870 F. Supp. 2d 856 (C.D. Cal. 2012) .........................................................53, 54

*Robinson-Smith* v. *Government Employees Insurance Co.*,
590 F.3d 886 (D.C. Cir. 2010)...................................................................*passim*

*Roe-Midgett* v. *CC Services, Inc.*, 512 F.3d 865 (7th Cir. 2008) ..............*passim*

*Smith* v. *City of Jackson*, 954 F.2d 296 (5th Cir. 1992) .....................................27

*Talbert* v. *American Risk Insurance Co.*,
405 Fed. Appx. 848 (5th Cir. 2010)...........................................................45, 49

*Vela* v. *City of Houston*, 276 F.3d 659 (5th Cir. 2001) .......................................57

*Verkuilen* v. *MediaBank, LLC*, 646 F.3d 979 (7th Cir. 2011) ............................4

*Williams* v. *GENEX Services, Inc.*,
Civ. No. 13-1942, 2014 WL 4388360 (D. Md. Sept. 4, 2014) ........................54

*Withrow* v. *Sedgwick Claims Management Services, Inc.*,
841 F. Supp. 2d 972 (S.D. W. Va. 2012) .......................................43, 44, 46, 53

*Zannikos* v. *Oil Inspections (U.S.A.), Inc.*,
605 Fed. Appx. 349 (5th Cir. 2015)...........................................................41, 44

## STATUTES AND REGULATIONS

Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ...................................*passim*

29 U.S.C. § 202 .................................................................................................3

29 U.S.C. § 206 .................................................................................................3

Page

Statutes and regulations—continued:

29 U.S.C. § 207 .................................................................3, 27

29 U.S.C. § 212 .....................................................................3

29 U.S.C. § 213 ............................................................4, 5, 27

29 C.F.R. § 541.200 ...........................................................*passim*

29 C.F.R. § 541.201 ...........................................................*passim*

29 C.F.R. § 541.202 ...................................................6, 7, 44, 45

29 C.F.R. § 541.203 ...........................................................*passim*

29 C.F.R. § 541.300 ...................................................8, 51, 52

29 C.F.R. § 541.301 ...........................................................*passim*

29 C.F.R. § 541.700 ............................................................28

29 C.F.R. § 541.704 ...................................................7, 46, 49

22 Tex. Admin. Code § 214.9 ..............................................13

22 Tex. Admin. Code § 215.9 ..............................................12

22 Tex. Admin. Code § 217.2 ........................................12, 13

Tex. Ins. Code § 4201.153 ............................................16, 50

Tex. Ins. Code § 4201.252 ..................................................12

## MISCELLANEOUS

Department of Labor, Wage and Hour Division, *Defining and
    Delimiting the Exemptions for Executive, Administrative,
    Professional, Outside Sales, and Computer Employees*, 69 Fed.
    Reg. 22,122 (2004) ....................................................4, 5, 37

Page

Miscellaneous—continued:

Department of Labor, Wage and Hour Division, *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 80 Fed. Reg. 38,516 (2015) ....................................................................................28, 29

S. Rep. No. 75-884 (1937) ...............................................................................3

Texas Department of Insurance, *Superior HealthPlan* <tinyurl.com/SuperiorHP> (last visited Oct. 21, 2015) ..............................10

Texas Health and Human Services Commission, *Texas Medicaid and CHIP: Managed Care Medical and Dental Plans* <tinyurl.com/texasmanagedcare> (last visited Oct. 21, 2015).....................9

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331.  The district court entered final judgment on June 4, 2015.  *See* ROA.4926-4932.  Appellant filed a timely notice of appeal on July 2, 2015.  *See* ROA.5464-5465.  The jurisdiction of this Court rests on 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether plaintiffs are exempt from the Fair Labor Standard Act's overtime requirement as administrative employees.

2.     Whether plaintiffs are exempt from the Fair Labor Standard Act's overtime requirement as learned professionals.

## STATEMENT OF THE CASE

The Fair Labor Standards Act requires employers to pay overtime compensation to certain employees who work more than 40 hours a week. The Act exempts a number of employees from that requirement, including any person employed in an "administrative" or "professional" capacity.

Appellant Centene Company of Texas, L.P., is a managed-care company.  It manages and administers Superior HealthPlan Inc., a licensed insurer that provides health-insurance plans to individuals enrolled in government-sponsored programs such as Medicaid and Medicare.  In performing that function, Centene employs "utilization review nurses."  Much like traditional insurance claims adjusters, Centene's nurses review requests to cover cer-

(1)

tain medical services; assess whether those services are medically necessary; and then either authorize payments of the claims or recommend their denial. Because assessing medical necessity requires specialized knowledge, a utilization review nurse was required to have a valid nursing license and two to three years of clinical experience.  Consistent with industry practice, Centene classified its utilization review nurses as exempt from overtime requirements and compensated them with competitive salaries and other benefits.

Five former Centene utilization review nurses filed a putative collective action under the Fair Labor Standards Act in the United States District Court for the Western District of Texas, alleging that they were improperly classified as exempt and seeking unpaid overtime compensation.  After certifying a statewide, opt-in class, the district court held at the summary-judgment stage that the nurses were not exempt as administrative or professional employees.  Following a bench trial, the district court awarded damages to 21 plaintiffs, including both named and opt-in plaintiffs.  This appeal follows.

## A.    Statutory And Regulatory Background

During the Great Depression, Congress enacted the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*  The Act was intended to address "labor conditions detrimental to the maintenance of the minimum standard of

living necessary for [the] health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). More specifically, the "prime purpose" of the Act was "to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." *Brooklyn Savings Bank* v. *O'Neil*, 324 U.S. 697, 707 n.18 (1945). At the same time, the Act was never intended to "invade the right of [the] employer and employee to fix their own contracts of employment, wherever there can be any real, genuine bargaining between them." S. Rep. No. 75-884, at 3 (1937).

To achieve its objectives, the Act establishes a "few rudimentary standards," so essential that failure to abide by them "must be regarded as socially and economically oppressive." S. Rep. No. 75-884, *supra*, at 3 (statement of President Roosevelt). Among other things, the Act proscribes the use of child labor and imposes a minimum wage for most jobs. *See* 29 U.S.C. §§ 206(a), 212(c).

Of particular relevance here, the Act establishes a general rule that employers must pay their employees overtime wages for work in excess of 40 hours in a workweek. *See* 29 U.S.C. § 207(a). In order to avoid disrupting employment relationships that are not oppressive, however, the Act creates a number of exemptions to the general overtime rule. In particular, the Act

exempts "any employee employed in a bona fide . . . administrative[] or professional capacity." 29 U.S.C. § 213(a)(1).

Congress had good reasons for exempting administrative and professional employees from the overtime regime. The legislative history reflects Congress' view that such employees "typically earn[] salaries well above the minimum wage" and are "presumed to enjoy other compensatory privileges such as above average fringe benefits and better opportunities for advancement, setting them apart from the nonexempt workers entitled to overtime." Department of Labor, Wage and Hour Division, *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed. Reg. 22,122, 21,124 (2004) (discussing legislative history). Moreover, such employees perform discretionary tasks that are "difficult to standardize to any time frame" and cannot "be easily spread to other workers after 40 hours in a week, making compliance with the overtime provisions difficult." *Id.* Also, such employees "usually are expected to work with a minimum of supervision" and often perform work "off the employer's premises"—with the result that, if entitled to overtime, such employees "would be tempted to inflate [their] hours." *Verkuilen* v. *MediaBank, LLC*, 646 F.3d 979, 981 (7th Cir. 2011).

In the Act, Congress authorized the Department of Labor (Department) to promulgate regulations defining the terms "administrative" and

"professional." 29 U.S.C. § 213(a)(1).  The Department initially issued regulations in 1938 and has updated those regulations on numerous occasions, most recently in 2004.  *See* 69 Fed. Reg. 22,122.  This case concerns the interpretation and application of those regulations.

### 1.     The Administrative Exemption

The Department's regulations define an "administrative" employee as an individual (1) who is "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week"; (2) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

With regard to the second prong of the test, the regulations explain that an administrative employee "must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a).  Work that is "directly related to management or general business operations" includes work in such functional areas as "insurance," "auditing," "legal and regulatory compliance," and "similar activities." 29 C.F.R. § 541.201(b).  The regulations make clear that an employee may qualify for the exemption if his or her

work relates either to the employer's own management or general business operations or to those of the employer's customers.  29 C.F.R. § 541.201(c).  Thus, "employees acting as advisers or consultants to their employer's clients or customers  .  .  .  may be exempt." *Id.*

With regard to the third prong of the test, the Department's regulations explain that the requisite "exercise of discretion and independent judgment" "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a).  Relevant factors to consider when determining if an employee meets that requirement include "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices"; "whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business"; "whether the employee has authority to commit the employer in matters that have significant financial impact"; "whether the employee has authority to negotiate and bind the company on significant matters"; and "whether the employee provides consultation or expert advice to management." 29 C.F.R. § 541.202(b).

The regulations further explain that, while administrative employees typically have "authority to make an independent choice, free from immedi-

ate direction or supervision," they may still qualify "even if their decisions or recommendations are reviewed at a higher level." 29 C.F.R. § 541.202(c). In addition, administrative employees may consult manuals or guidelines when exercising their discretion; "[t]he use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption." 29 C.F.R. § 541.704.

Finally, the regulations specifically codify the Department's longstanding position that insurance claims adjusters "generally meet the duties requirements for the administrative exemption, whether they work for an insurance company or other type of company." 29 C.F.R. § 541.203(a). Insurance claims adjusters are exemplars of the type of employee to whom the administrative exemption applies; they typically qualify for the exemption because "their duties include activities such as interviewing insureds, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation." *Id.*

## 2.    *The Professional Exemption*

The Department's regulations also define the category for "professional" employees—a category that includes so-called "learned professionals."  29 C.F.R. §§ 541.300, 541.301.  To qualify as a learned professional, an employee must (1) be "[c]ompensated on a salary or fee basis at a rate of not less than $455 a week" and (2) have a "primary duty" consisting of "work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction."    29 C.F.R. §§ 541.300(a), 541.301(a).

As is relevant here, the regulations specifically provide that registered nurses "who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption." 29 C.F.R. § 541.301(e)(2).  By contrast, licensed practical nurses "generally" do not qualify, "because possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations."  *Id.*  The regulations make clear that the lack of an advanced degree is not dispositive: the exemption "is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction."  29 C.F.R. § 541.301(d).

### B.    Factual Background

1.    Like many States, the State of Texas contracts with private managed-care organizations to create and offer health-insurance plans to individuals enrolled in government health-care programs such as Medicaid, Medicare, and the Children's Health Insurance Program (CHIP).  The State then pays those organizations a fixed monthly premium for each individual or "member" enrolled in their health-insurance plans.  In exchange, the managed-care organizations administer the plans and provide all covered "medically necessary" services to their members.  To do so, the organizations contract with doctors and other health-care providers to create provider networks for their members to use.  *See, e.g.*, Texas Health and Human Services Commission, *Texas Medicaid and CHIP: Managed Care Medical and Dental Plans* <tinyurl.com/texasmanagedcare> (last visited Oct. 21, 2015).

The managed-care model has several advantages over other models for government-sponsored health care.  Historically, States purchased medical services on a fee-for-service basis.  Unsurprisingly, that system led to the increased utilization of services, driving up costs in excess of state budgets.  ROA.4072.  The traditional system also did not address the underlying problem that many enrollees passed up routine or preventive services and instead sought care in emergency rooms at higher costs.  *See* Centene Corp., Annual Report 2 (Form 10-K) (Feb. 23, 2015).

9

The managed-care model addresses those concerns. To begin with, managed-care organizations deliver superior health outcomes by ensuring the availability of health-insurance plans to members, coordinating patient care under those plans, and promoting the use of routine and preventive services. ROA.4072, 4075-4076; Annual Report 7-8. Managed-care organizations also "provide budget predictability" by charging States a fixed monthly premium per member. Annual Report 6. And of particular importance here, managed-care organizations control costs by administering their plans through a process known as "utilization review." ROA.4073. Health-care providers must submit authorization requests before providing medical services, and the managed-care organization reviews the requests to verify that the services are both "medically necessary" and "appropriate." ROA.4502-4503. Thus, by implementing managed care, States can not only "improve quality of care" but also "reduce program costs." ROA.4072.

2. Appellant Centene Company of Texas, L.P. (Centene), is a managed-care company. ROA.1795. It manages Superior HealthPlan Inc., an insurance company that is licensed by the Texas Department of Insurance and contracts with the State of Texas. ROA.1795; Texas Department of Insurance, *Superior HealthPlan, Inc.* <tinyurl.com/SuperiorHP> (last visited Oct. 21, 2015).[1] Superior HealthPlan provides health-insurance coverage to

---

[1] Centene and Superior HealthPlan are subsidiaries of Centene Corporation, a publicly traded company. Centene Corporation does not employ any

over 900,000 members in Texas through government-sponsored programs such as Medicaid, Medicare, and CHIP and, more recently, through the health-insurance marketplaces established by the Affordable Care Act. ROA.1795, 2530-2531. Centene employs the individuals responsible for fulfilling Superior HealthPlan's contractual obligations to the State. ROA.1795-1796.

One of Superior HealthPlan's contractual obligations is to administer the health plans by conducting utilization review. Superior HealthPlan is required to a have a written utilization management program for determining whether requested services are medically necessary and appropriate. ROA 2388-2435, 3271. The applicable contracts generally provide that, within two or three days of receiving a request from a health-care provider, Superior HealthPlan must issue a coverage determination. ROA.2919-2920, 3063-3064. Centene makes these determinations for Superior HealthPlan. ROA.1795-1796. If Centene approves a request, it sends an approval letter to the health-care provider. ROA.3271. After the services are rendered, the provider submits an insurance claim to Centene's claims department for payment. *Id.*

---

of the employees at issue here (and indeed has no employees at all). ROA.1078-1079.

3.     Consistent with the requirements of Texas law, Centene employs nurses to perform utilization review. *See* Tex. Ins. Code § 4201.252(b). During the time period relevant to this litigation, those nurses, also known as case managers, fell into two general categories. ROA.4503. Prior authorization nurses reviewed requests for outpatient medical services, and concurrent review nurses reviewed requests for inpatient services. *Id.* Both types of nurses were "responsible for the same basic tasks: reviewing medical authorization requests to determine whether a medical procedure requested by a healthcare provider [was] medically necessary." ROA.4886.

In order to make determinations about medical necessity, nurses must have specialized knowledge about "generally accepted medical practices." ROA.2409. For that reason, as relevant here, Centene required all utilization review nurses (1) to be licensed as a registered nurse, licensed practical nurse, or licensed vocational nurse,[2] and (2) to have at least two or three years of clinical nursing experience. ROA.4503; *see* ROA.2146-2160 (job postings). In Texas, a registered nurse must complete an educational program of between two and four years and pass a licensing examination. 22 Tex. Admin. Code §§ 215.9(a)(1), 217.2(a). Similarly, a licensed vocational nurse must complete an educational program of approximately one year and

---

[2] Licensed practical nurse and licensed vocational nurse are "essentially identical roles given different names by different state regulators." ROA.4503. In Texas, regulators use the latter term. *Id.*

pass a licensing examination. *Id.* §§ 214.9(a)(1), 217.2(a).  Many utilization review nurses also have bachelor's degrees, master's degrees, or advanced certifications. *See*, *e.g.*, ROA.2168, 3963, 4013, 4048, 5691; *see also* ROA.4511.

Regardless of their particular credentials, utilization review nurses perform the same responsibilities.  ROA.2146-2160.  The process of conducting utilization review is as follows.  Once a health-care provider submits an authorization request, a referral specialist enters the request into Centene's case management system.  ROA.3059-3061.  A Centene supervisor then assigns the request to a particular nurse.  ROA.3283.  Upon receiving the request, the nurse makes a preliminary determination whether the request should be referred to one of Centene's medical directors, who are licensed physicians.  ROA.2564, 3283, 3453.  The nurse makes such a referral if, for example, the request regards "experimental" procedures or is from an out-of-network provider.  ROA.3453.  Otherwise, the nurse proceeds to conduct the utilization review himself or herself.  *Id.*

As a first step, the nurse collects what he or she assesses to be all of the relevant clinical information about the member in question.  ROA.2344. That information may include medical records, lab results, and notes from the treating physician.  ROA.2341, 3346.  In some cases, the nurse contacts the health-care provider by phone and asks for the information or clarifications.  ROA.3346.  In others, the nurse travels to the hospital, reviews the

member's medical charts, consults with the treating physician, and collects information from the member or his or her family.  ROA.2341, 2344, 2348. After obtaining the relevant information, the nurse assesses the member's medical condition, "including factors that may require special consideration such as age, co-morbidities, complications, progress of treatment, psychological issues, home environment, acute vs. chronic condition, and/or life threatening illness."  ROA.3453-3454.

The nurse then applies Centene's internal guidelines to assess whether the requested treatment is medically necessary and appropriate.  ROA.2560, 2565.  If there is no internal guideline on point, the nurse turns to an industry-standard set of guidelines.  *Id.*

Interpreting and applying treatment guidelines requires considerable medical knowledge and expertise.  ROA.2598, 2970-2971.  For example, Centene's internal guideline on speech, occupational, and physical therapy requires a nurse to assess whether the member "exhibits signs and symptoms of physical deterioration or impairment" in the areas of "Sensory/Motor Ability," "Functional Status," "Cognitive/Psychological Ability," "Cardiopulmonary Status," and "Speech/Language/Swallowing Ability."  ROA.2368. The guideline then requires the nurse to determine if the requested treatment "meets accepted standards of discipline-specific clinical practice and is

targeted and effective in treatment of the Member's diagnosed impairment or condition." ROA.2369.

The industry-standard guidelines are similarly esoteric. For example, the InterQual guideline for "Acute Coronary Syndrome" requires a nurse to assess whether the member has "[p]ositive cardiac biomarkers," "[r]est angina," or "[i]ncreasing angina duration, frequency, or intensity." ROA.2443. The guideline further directs the nurse to assess whether the member's electrocardiogram indicates "ST depression," "T wave inversion," or "[p]acemaker rhythm." *Id.*

If a nurse determines that a member's clinical information satisfies the applicable guideline, the nurse approves the request and issues an authorization number to the provider. ROA.3454. No further authorization is needed. If the nurse determines that the applicable guideline is not satisfied, the nurse has discretion to discuss his or her concerns with the treating physician and listen to the physician's explanation. ROA.2344, 2356. The nurse may also propose alternative treatment options or explore "opportunities for fee negotiation." ROA.2344, 2353. In performing those tasks, nurses are expected to exercise their "clinical judgment." ROA.2548.

If, after such further consultation, the nurse determines that the applicable guideline is still not satisfied, the nurse refers the request to a medical director. ROA.3454. In so doing, the nurse prepares a written narrative,

documenting the clinical information he or she considers relevant and explaining why the request does not comply with guidelines. *Id*; *see* ROA.2249-2293 (examples).

Of course, no set of guidelines could cover every conceivable medical scenario. For that reason, Centene's utilization review nurses are expected to exercise independent judgment and discretion. In fact, Texas law requires that Centene's guidelines must be "flexible enough to allow a deviation from the norm when justified on a case-by-case basis." Tex. Ins. Code § 4201.153(c). Thus, even where a request does not satisfy the applicable guideline, a nurse can—and often will—recommend that the medical director approve the request. *See, e.g.*, ROA.2257, 2277, 2278, 2279, 2286, 2290, 2291, 2292, 2293. Conversely, even if a request does satisfy the applicable guideline, the nurse may nonetheless deem it medically unnecessary or inappropriate and recommend that the medical director deny the request. ROA.2561. The nurse will often collaborate with the medical director on the final coverage determination. ROA.2591.

Utilization review nurses also advise Centene's management on the guidelines themselves. For example, when Centene adopts a new guideline, it asks its nurses to provide feedback in order to make the guideline more useful. ROA.2552-2553. Nurses may also propose guidelines to fill gaps in Centene's existing guidelines. *Id.*

Centene's nurses perform their day-to-day responsibilities with little or no direct supervision. Each nurse has his or her own caseload and is expected to perform a certain number of reviews per day. ROA.2539-2540. But it is up to each nurse to decide how best to manage his or her time. *See* ROA.2355. Centene's supervisors generally audit a nurse's work only on a monthly basis. ROA.1885-1886; 2536; 2699-2700.

What is more, Centene permits its nurses to perform their utilization reviews on laptops at home, and some nurses do so exclusively. ROA.1398, 2578-2579, 2599, 2698, 4886. Many nurses also spend several hours per day driving to and from hospitals and collecting clinical information. ROA.2168, 2189, 2217, 2600-2601, 2669, 3935. Thus, as a practical matter, Centene has no way to monitor the activities of its nurses on a minute-by-minute basis.

4.   Consistent with industry practice, during the relevant time period, Centene classified its utilization review nurses as exempt from overtime requirements and paid them competitive salaries. ROA.752, 2759-2760. Nurses in plaintiffs' positions generally earned between $934 and $1,335 per week. ROA.4595-4633 (stipulated facts). In addition, nurses were eligible for bonuses based on company and individual performance. ROA.769-770. Nurses were also eligible for a host of benefits including medical insurance, life insurance, disability insurance, worker's compensation insurance, a retirement savings plan, and an employee stock purchase program. ROA.757,

1825.  Nurses received paid time off for holidays, vacation, sick days, and personal leave.  ROA.758, 885, 1388, 1825.

### C.    Procedural History

1.    Five former Centene utilization review nurses filed a putative collective action under the Fair Labor Standards Act in the United States District Court for the Western District of Texas, alleging that they were improperly classified as exempt and seeking unpaid overtime compensation. ROA.35-46.  While the named plaintiffs initially brought suit against Superior HealthPlan and Centene Corporation as well as appellant Centene, ROA.35, the district court dismissed the claims against those other defendants on the ground that the named plaintiffs were employed only by Centene, ROA.1077-1091, 2037.  The district court then conditionally certified an opt-in class of current or former utilization review nurses employed by Centene throughout the State of Texas since 2009, ROA.1598-1606, and 22 additional nurses opted into the action, ROA.4887.

Following discovery, both parties moved for summary judgment on the question whether the utilization review nurses were exempt from overtime under the administrative exemption or the professional exemption. ROA.2105-2130, 3216-3244.

2.    The district court denied Centene's motion and granted the plaintiffs' motion in relevant part, holding that the utilization review nurses were not exempt.  ROA.4502-4529.

a.    As is relevant here, the district court held that the nurses were not exempt under the administrative exemption.  ROA.4512-4517.  The court noted that there was no dispute that plaintiffs were compensated more than $455 a week or that they performed office or non-manual work.  ROA.4512.  The court concluded, however, that plaintiffs did not perform work directly related to the business operations of Centene or its customer.  ROA.4512-4517.  Relying on a dichotomy between "staff" and "production" workers, the court characterized Centene's "product" not as the provision of health-insurance plans, but rather as "the service of administering Medicaid claims."  ROA.4513-4514.  Based on that characterization, the court concluded that utilization review nurses were responsible for "directly producing the good or service that is primary output of [Centene's] business."  ROA.4517 (internal quotation marks and citation omitted).  The court further opined that, if plaintiffs were administrative employees, it would be "difficult to conceptualize who within the Centene organization is *not* an administrative employee."  ROA.4514.

In holding that the nurses were not exempt under the administrative exemption, the district court rejected Centene's argument that utilization re-

view nurses were analogous to exempt insurance claims adjusters. ROA.4514. Repeating its characterization of Centene's "product," the court reasoned that Centene "is not an insurance company and does not sell insurance policies," but rather produces the "service of administering Medicaid claims for the State of Texas." *Id.* The nurses, the court continued, "are directly involved in the production and provision of that service, unlike claims adjusters who process claims made under their employers' insurance products." *Id.* The court further reasoned that the nurses did not perform duties typical of insurance adjusters, "[o]ther than 'evaluating and making recommendations regarding coverage of claims.'" ROA.4515 (citation omitted).

The district court also rejected Centene's argument that its utilization review nurses perform administrative tasks for Centene's customer, the State of Texas. ROA.4516. In so doing, the court reasoned that cases applying the administrative exemption to employees who process claims for the employer's customer were "distinguishable" because they involved "classic" insurance claims adjusters. *Id.* The court added that such adjusters have a "special place in FLSA jurisprudence, as shown by the prominent place of insurance claims adjusters" in the regulations. *Id.*

b.    The district court also held that the nurses were not exempt under the professional exemption: specifically, the exemption for "learned professionals." ROA.4506-4511. The court did not address whether the nurses

20

performed work requiring advanced knowledge in a field of science or learn-ing; instead, it found that the knowledge was not the type customarily ac-quired by a prolonged course of specialized instruction. ROA.4508-4511. In so concluding, the court noted that the minimum requirements for the posi-tion were status as a licensed vocational nurse or licensed practical nurse, plus two or three years of clinical experience. ROA.4508. The court then cit-ed the regulation stating that licensed practical nurses "generally" are not exempt because they lack "specialized advanced academic degree[s]." ROA.4507. The court rejected Centene's argument that its nurses acquired advanced knowledge through a combination of work experience and intellec-tual instruction. ROA.4509-4511. Because licensed practical nurses acquire the advanced knowledge they bring to Centene "primarily as result of their clinical experience," the court concluded that the learned-professional ex-emption was "not intended to cover such employees." ROA.4511.

8.     The district court held a bench trial on the remaining issues, in-cluding the statute of limitations and damages. ROA.4885-4917. The court dismissed the claims of four class members as time-barred, dismissed one class member based on a stipulation of the parties, and found that one class member had failed to prove she worked more than 40 hours per week. ROA.4887, 4915. The court awarded the remaining 21 class members com-

pensatory and liquidated damages for unpaid overtime. *Id.*; *see also* ROA.4926-4932 (final judgment).

## SUMMARY OF ARGUMENT

The district court erroneously held that plaintiffs were not exempt from the overtime requirement of the Fair Labor Standard Act. Plaintiffs are not the type of employees Congress enacted the FLSA to protect. Instead, they are well-compensated white-collar workers who enjoy a significant amount of discretion and flexibility in their jobs. Consistent with the terms of the FLSA and the intention of Congress, plaintiffs should not be subject to the FLSA's overtime requirement. The Court should correct the district court's legal error and reverse the judgment in plaintiffs' favor.

A.    To begin with, plaintiffs meet the criteria for the FLSA's administrative exemption. To qualify for that exemption, employees must be compensated at a minimum level and perform as their "primary duty" "office or non-manual work directly related to the  . . .  general business operations of the employer or the employer's customer[]" which "includes the exercise of discretion and independent judgment." 29 C.F.R. § 541.200(a). It is undisputed that plaintiffs meet the salary requirement, and they satisfy the other two requirements as well.

1.    Plaintiffs' primary duty was directly related to the general business operations of their employer, Centene. According to the undisputed

facts, Centene is a managed-care company in the health insurance business. Specifically, it manages and performs the functions of Superior HealthPlan, which provides health insurance plans to individuals enrolled in governments sponsored programs. Just as a provider of home, life, or automobile insurance "produces" insurance policies, Centene assembles networks of doctors and hospitals and determines the range of medical services covered under Superior HealthPlan.

Among the myriad services Centene provides is utilization review. Utilization review nurses (such as plaintiffs) do not create the health plan; instead, they help to administer it. The primary duty of utilization review nurses is to determine whether services requested are medically necessary and appropriate—and, based on that determination, to approve coverage of the services or recommend their denial. They do so by investigating the plan member's diagnoses and medical history, determining which information is pertinent to the coverage determination, using their medical knowledge and judgment to apply relevant guidelines, and approving or recommending denial of coverage for the service at issue. Utilization review nurses thus perform the same basic function as insurance claims adjusters. And like insurance claims adjusters, plaintiffs performed work that was quintessentially administrative. *See* 29 C.F.R. § 541.203(a).

The district court misconstrued Centene's business when it stated that Centene's "product" was utilization review, and it erred when it categorized plaintiffs as "production" workers. And the district court veered further off the analytical rails when it discounted the relevance of the Department of Labor's guidance regarding insurance claims adjusters. Indeed, this Court has already recognized the applicability of the administrative exemption in the context of insurance claims adjusters—and it is but a small step from that decision to a similar outcome here. Even if Centene's primary function was utilization review, moreover, its utilization review nurses were still providing an administrative service to Centene's customer, the State of Texas, by making coverage determinations for the health plan. In short, plaintiffs' primary duty directly related to the general business operations of Centene or its customer, and they therefore satisfy that element of the administrative-exemption test.

2.    In addition, plaintiffs were required to exercise discretion and independent judgment in performing their primary duty. As this Court has previously observed, that prong of the administrative-exemption test considers whether an employee considered and evaluated alternative courses of conduct and took action after various possibilities had been considered. Plaintiffs plainly did so here.

As utilization review nurses, plaintiffs were required to gather medical information about plan members, assessing what would be useful in making a coverage determination and whether additional investigation was necessary. They then determined whether, based on their analysis of that information, a requested medical service would be covered.  They did so through the use of complicated guidelines that required a medical background to understand and apply, and judgment to interpret.  If plaintiffs determined a medical service qualified for coverage, that service was approved without further review. And if they determined a request would be denied, they could explore other options, such as suggesting alternative treatments that would be covered. When plaintiffs recommended denial of a request, they would provide a written narrative of the relevant medical information and the reasons for their recommendation to a medical director, a licensed physician, who would make a final decision about the denial based upon that narrative.

As part of their primary duty, therefore, plaintiffs plainly considered alternative courses of action and made a determination after considering various possibilities.  As the Department of Labor's regulations and decisions of this Court make clear, it is no barrier to plaintiffs' classification as administrative employees that they consulted with guidelines and did not have final decisionmaking authority in one respect.  Plaintiffs thus meet all of the re-

quirements for the administrative exemption, and the district court erred when it held to the contrary.

B.    In the alternative, plaintiffs meet the requirements for the FLSA's professional exemption:  specifically, the regulatory exemption for so-called "learned professionals."  With regard to that exemption, the district court failed to recognize that the advanced knowledge plaintiffs used was of a type customarily acquired through a prolonged course of specialized instruction, because the standard prerequisites for becoming a utilization review nurse at Centene were a nursing license obtained through a required educational program *and* at least two years of specialized experience.  Because plaintiffs satisfy all of the requirements under the regulatory exemption for learned professionals, the district court erred by holding that plaintiffs were not exempt from the FLSA's overtime requirement under that exemption, just as it erred with regard to the administrative exemption.

In sum, the district court's ultimate holding that plaintiffs were subject to the FLSA's overtime requirement was incorrect.  The judgment in plaintiffs' favor should therefore be reversed.

## STANDARD OF REVIEW

This Court reviews a ruling on summary judgment de novo, applying the same standards as the district court.  *See, e.g.*, *Owsley* v. *San Antonio Independent School District*, 187 F.3d 521, 523 (5th Cir. 1999).  "[T]he ulti-

mate decision whether an employee is exempt [from the FLSA's overtime-compensation provisions] is a question of law." *Smith* v. *City of Jackson*, 954 F.2d 296, 298 (5th Cir. 1992). Any questions of historical fact ancillary to that decision, however, are reviewable only for clear error. *See id.* Employers have the burden of showing that an employee is exempt under the FLSA, and the FLSA's exemptions are narrowly construed. *See Owsley*, 187 F.3d at 523.

**ARGUMENT**

**THE DISTRICT COURT ERRONEOUSLY HELD THAT PLAINTIFFS WERE NOT EXEMPT FROM THE OVERTIME REQUIREMENT OF THE FAIR LABOR STANDARDS ACT**

The Fair Labor Standards Act establishes the familiar baseline rule that employers must pay their employees overtime wages for work in excess of 40 hours in a workweek. *See* 29 U.S.C. § 207(a). That rule, however, is subject to a number of exemptions, including for "any employee employed in a bona fide . . . administrative[] or professional capacity." 29 U.S.C. § 213(a)(1).

As well-compensated white-collar workers who enjoy a significant amount of discretion and flexibility in their jobs, utilization review nurses are exempt from the overtime requirements of the FLSA under either the administrative or professional exemption. The district court erred in holding

that plaintiffs were not exempt, and its judgment in plaintiffs' favor should therefore be reversed.

### A.    Plaintiffs Qualify For The Administrative Exemption From The FLSA's Overtime Requirement

Under the Department of Labor's regulations, the administrative exemption applies to any individual (1) who is "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week"; (2) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."   29 C.F.R. § 541.200(a).  An employee's "primary duty," in turn, is "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  Plaintiffs here satisfy all three of those requirements, and the district court therefore erred by holding that the administrative exemption is inapplicable.

### 1.    *Plaintiffs Earned At Least Double The Required Amount Per Week*

The Department has "long recognized the salary level test as 'the best single test' of exempt status."  Department of Labor, Wage and Hour Division, *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 80 Fed. Reg.

38,516, 38,517 (2015).  There is no dispute that plaintiffs' salaries were at least *double* the amount required.  *See* ROA.4595-4633 (stipulation that plaintiffs earned between $934.38 and $1,335.80 per week).  Plaintiffs thus easily meet the first prong of the administrative-exemption test.[3]

### 2. Plaintiffs Performed Office Or Non-Manual Work Directly Related To The General Business Operations Of Centene Or Its Customer

Plaintiffs do not contest that their jobs consisted of "office or non-manual work."  *See* ROA.4512.  For purposes of the second prong of the administrative-exemption test, therefore, the only question is whether plaintiffs' work was directly related to "the management or general business operations" of Centene or Centene's customer, the State of Texas.  *See* 29 C.F.R. § 541.200(a).[4]

---

[3] After plaintiffs initiated this suit, the Department of Labor issued a notice of proposed rulemaking to explore raising the salary level required for exemption.  *See* 80 Fed. Reg. 38,516.  The Department has not issued a final rule.  But even if the Department increased the salary level to the level proposed in the notice of proposed rulemaking, plaintiffs' salaries would still exceed the requirement.  The notice of proposed rulemaking did not propose any changes to the remaining prongs of the administrative-exemption test. *See id.* at 38,518.

[4] Centene manages Superior HealthPlan, which, in turn, contracts with the State of Texas to provide health insurance plans to individuals enrolled in government programs.  Because the State of Texas purchases the health plans, it is properly characterized as the customer of Centene and Superior. In all events, the exemption analysis turns not on which entity is Centene's customer, but on the function performed by the utilization review nurses.

The district court based its conclusion that plaintiffs' work was not related to the general business operations of Centene or its customer on its determination that plaintiffs were responsible for "directly producing the good or service that is the primary output of [Centene's] business." ROA.4517. In so concluding, the district court erred in two ways. *First*, it mischaracterized Centene's business by stating that Centene's "product" was the task that plaintiffs perform: "administering Medicaid claims." ROA.4514. As the parties seemingly agree, however, the "product" provided by Centene, through its management of Superior HealthPlan, was managed-care health plans; plaintiffs' task was to administer that "product." *See* ROA.4068-4081. *Second*, even assuming that the district court was correct that Centene's primary product is "administering Medicaid claims," plaintiffs' responsibilities were directly related to the general business operations of Centene's customer, the State of Texas. For both of those reasons, the district court erred by determining that plaintiffs' duties were not directly related to the general business operations of Centene or Centene's customer.

a.    *Plaintiffs' Work Was Directly Related To The General Business Operations Of Centene*

i.    As the Department of Labor's regulations make clear, work that is "directly related to the  .  .  .  general business operations" of an employer comprises "work directly related to assisting with the running or servicing of [a] business, as distinguished, for example, from working on a manufacturing

production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). Work that is "directly related to management or general business operations" includes work in such functional areas as "insurance," "auditing," "legal and regulatory compliance," and "similar activities." 29 C.F.R. § 541.201(b).

The applicable regulations proceed to provide specific guidance about certain positions. As is relevant here, they provide that insurance claims adjusters:

> generally meet the duties requirements for the administrative exemption, whether they work for an insurance company or other type of company, if their duties include activities such as interviewing insureds, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation.

29 C.F.R. § 541.203(a). Those regulations are instructive because Centene performs the functions of a health-insurance provider, and plaintiffs performed duties analogous to those of insurance claims adjusters. The district court erred by failing to recognize the applicability of those regulations and, using an outdated conceptual framework, by categorizing plaintiffs as "production" rather than administrative employees.

ii.    As plaintiffs themselves acknowledge, Centene is a managed-care company in the health insurance business. *See* ROA. 3250. It manages

Superior HealthPlan, which, pursuant to a contract with the State of Texas, provides health insurance to individuals enrolled in government programs. Just as a provider of home, life, or automobile insurance creates insurance policies, a managed-care organization assembles networks of doctors and hospitals and determines what medical services will be covered under the health plans it manages. *See* ROA.4068-4081. Centene performs these functions for Superior, enabling Superior to provide health plans to persons eligible to receive publicly funded health insurance. *See* ROA.1795-1796. Centene also administers the resulting health plans just as any insurance company would by, *inter alia*, making coverage determinations and processing claims for payment. *See id.*

As this Court has previously recognized, insurance companies are in the business of "producing" insurance policies—the equivalent of the health plans Centene produces through its management of Superior. In *Cheatham* v. *Allstate Insurance Co.*, 465 F.3d 578 (2006) (per curiam), this Court concluded that a group of insurance claims adjusters, whose primary duty was to "handle liability claims for bodily injury and damage to property," were employed in an administrative capacity. *Id.* at 585. To reach that conclusion, the Court considered whether the plaintiffs' duties "directly related to [defendant's] management policies or general business operations" or whether they involved "production." *Id.* The Court quickly determined that the in-

surance claims adjusters were not production employees, observing that "[a]n insurance company's product is its policies, and [the insurance claims adjusters'] duties did not include writing and selling insurance." *Id.*

This Court's approach in *Cheatham* is consistent with that of other courts. As the Sixth Circuit has explained in a case involving employees who investigated suspicious claims, an insurer is not in the business of "actually selling the promise of asset protection," but rather the business of "creating and marketing insurance policies to the public." *Foster* v. *Nationwide Mutual Insurance Co.*, 710 F.3d 640, 645 (6th Cir. 2013).

iii.    Rather than constituting the product that Centene produces, utilization review is simply one of the ways in which Centene administers Superior HealthPlan. At Centene, the primary duty of utilization review nurses (such as plaintiffs) is to determine whether services requested by health-care providers on behalf of plan members are medically necessary and appropriate—and, based on that determination, to determine whether the health plan will cover the services. ROA.2143, 3254, 4502-4503.[5]

---

[5] Plaintiffs were employed as two types of utilization review nurses: prior authorization nurses and concurrent review nurses. *See* ROA.4503; *see generally* p. 12, *supra* (explaining difference between two types of review). Although the two positions involved somewhat different responsibilities, the primary duties for both positions were the same: determining whether medical services were medically necessary and appropriate and determining whether a health plan will cover those services. ROA.4886.

The utilization review process worked as follows.[6]  When a request for coverage came in, after a preliminary determination as to whether the request should be referred to a medical director at the outset, the assigned nurse collected what he or she determined to be the relevant clinical information about the member, whether from medical records, contacts with the health-care provider, or onsite visits.  ROA.2341, 2344, 2348, 3346, 3453.  The nurse would then analyze the collected information and, applying guidelines setting forth coverage parameters, determine whether the requested treatment was necessary and appropriate—and therefore covered by the plan.  ROA.2560, 2565.[7]  Interpreting and applying those guidelines, which were often complicated and esoteric, required considerable medical knowledge and expertise.  ROA.2598, 2970-2971.

If the nurse determined that the service was medically necessary and appropriate, coverage was provided without further review.  ROA.3454.  If

---

[6] The material facts on the tasks performed by plaintiffs are undisputed— as evidenced by the parties' filing of cross-motions for summary judgment in which they agreed on those facts.  *See* ROA.3220, 4503-4504.  As this Court has explained, "cross-motions may be probative of the non-existence of a factual dispute when, as here, they demonstrate a basic agreement concerning what legal theories and material facts are dispositive."  *Bricklayers, Masons & Plasterers Int'l Union of America, Local Union No. 15* v. *Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975).

[7] Utilization review nurses first looked to Centene's internal guidelines to inform their coverage recommendations; if no applicable internal guideline existed, they turned to industry-standard guidelines.  ROA.2560, 2565.

the nurse determined that the service was not medically necessary, the nurse could discuss his or her concerns with the treating physician, propose alternative treatment options, or refer the request to a medical director, who would make the final determination.  ROA.2344, 2353, 2356, 3454.  When utilization review nurses referred requests to medical directors, they included a detailed written narrative providing the clinical information they considered relevant, and explaining why, in their estimation, the authorization request did not comply with the relevant guidelines.  ROA.3454; *see* ROA.2249-2293 (examples).

Although plaintiffs are not perfect analogues to insurance claims adjusters, they performed the same basic function:  determining whether a member's claim is covered and, consequently, whether the insurer should pay that claim.  Specifically, in the terms of the regulation governing insurance claims adjusters, plaintiffs were responsible for duties equivalent to "interviewing insureds, witnesses, and physicians" (by reviewing patient files and, in certain cases, visiting hospitals to gather information about a patient's condition); "reviewing factual information to prepare damage estimates" (by reviewing factual information to determine the type of medical services a patient needs); "evaluating and making recommendations regarding coverage of claims" (by evaluating whether the medical services a patient needs are covered and authorizing coverage or recommending denial); and

"negotiating settlements" (by discussing with providers the possibility of providing alternative treatment options when coverage would otherwise be denied). 29 C.F.R. § 541.203(a).

Notably, the only other federal court to have considered the application of the administrative exemption to employees with the same responsibilities as plaintiffs specifically relied on the analogy between the two positions in determining that the second prong of the administrative-exemption test was satisfied. *See Johnson* v. *WellPoint, Inc.* Civ. No. 06-2430, 2009 WL 8753325, at *19 (N.D. Ga. Mar. 30, 2009) (determining that the plaintiffs were "similar" to insurance claims adjusters "in that they administer employment benefits for [their employer's] customers").

By performing functions necessary to the administration of the health plan, plaintiffs were performing "work directly related to assisting with the running or servicing of [Centene's] business." 29 C.F.R. § 541.201(a). Plaintiffs were not responsible for creating Centene's product; they did not assemble the doctors and hospitals that constitute the plans' networks, determine the range of medical services covered by the plans, or participate in contract negotiations with the State. *See Cheatham*, 465 F.3d at 585; *Foster*, 710 F.3d at 645; *Johnson*, 2009 WL 8753325, at *19. Like insurance claims adjusters, plaintiffs performed quintessentially administrative duties.

iv.   Courts sometimes apply a construct known as the "administrative-production dichotomy" to assist in determining whether an employee's duties satisfy this prong of the administrative-exemption test. *See, e.g., Foster*, 710 F.3d at 644.  Under that construct, "production employees (whose job it is to generate the product or service the business offers to the public) will not qualify for the exemption." *Id.*  A number of other courts of appeals, however, have recognized that the "administrative-production dichotomy" is neither precise nor dispositive when applied in the white-collar context. *See id.*  As the Seventh Circuit has explained, "the so-called production/administrative dichotomy—a concept that has an industrial age genesis—is only useful by analogy in the modern service-industry context." *Roe-Midgett* v. *CC Services, Inc.*, 512 F.3d 865, 872-873 (7th Cir. 2008).  And the Department of Labor itself has specifically rejected the proposition that "the dichotomy has ever been or should be a dispositive test for exemption."  69 Fed. Reg. 22,141.

The district court nevertheless erroneously categorized plaintiffs as production workers; treated that determination as dispositive of the administrative-exemption inquiry; and refused to recognize that plaintiffs' position is a close analogue to the position of insurance claims adjuster. *See* ROA.4513-4517.  The district court's first error was simply misconstruing Centene's explanation that its business was "administering government sponsored health

plans"—a shorthand means of describing the relationship explained above—
to mean that Centene provided only "the service of administering Medicaid
claims." ROA.4513-4514. The uncontroverted evidence is to the contrary.
The State of Texas does not create its own health plans (or acquire them
through other means) and then contract solely for utilization review; instead,
the State contracts with Superior HealthPlan to provide health-insurance
coverage to persons eligible for state-funded medical insurance. Centene
administers that product internally through the use of, among others, utiliza-
tion review nurses. Put simply, plaintiffs were administrators, not produc-
ers.

In addition to misunderstanding the nature of Centene's business, the
district court incorrectly declined to consider relevant case law involving tra-
ditional insurance companies. *See* ROA.4514-4515. Because Centene,
through its management of Superior, produces medical insurance, case law
analyzing the applicability of the administrative exemption to employees of
analogous businesses, such as providers of life, automobile, or home insur-
ance, should have been highly persuasive. But the district court blithely dis-
tinguished those cases on the grounds that Centene "is not an insurance
company and does not sell insurance policies" and that "Plaintiffs' duties are
largely distinct from those of an insurance claims adjuster." *Id.*

Neither of those grounds serves as a valid basis for distinguishing decisions involving traditional insurance companies. To begin with, as explained above (and as plaintiffs did not dispute below), Centene performs the functions of a health-insurance provider, managing Superior HealthPlan and acting as any private health-insurance company would. *See* pp. 10-11, 33, *supra*. In addition, although the district court is correct that plaintiffs did not perform *all* of the typical duties of an insurance claims adjuster, their activities are analogous. Indeed, as also noted above, the only other federal court to have considered the application of the administrative exemption to employees with the same responsibilities as plaintiffs considered them analogous to insurance claims adjusters. *See Johnson*, 2009 WL 8753325, at *19; pp. 36, *supra*. And multiple courts of appeals have recognized that the Department of Labor's guidance about insurance claims adjusters is applicable to employees that perform a subset of the tasks listed in the regulation. *See Foster*, 710 F.3d at 645-646; *Robinson-Smith* v. *Government Employees Insurance Co.*, 590 F.3d 886, 896-897 (D.C. Cir. 2010); *Roe-Midgett*, 512 F.3d at 873.

Those decisions are consistent with the regulatory language, which explains that insurance claims adjusters are exempt if their duties "*include* activities *such as*" those listed in the regulation. 29 C.F.R. § 541.203(a) (emphases added). Put another way, the Department plainly intended its guid-

ance about insurance claim adjusters to be exemplary, not exhaustive. The district court was therefore incorrect to discount the import of decisions involving traditional insurance companies in determining whether plaintiffs performed administrative duties.

Under an accurate understanding of the undisputed facts concerning Centene's business and a proper application of cases involving traditional insurance companies to those facts, it is clear that plaintiffs' work was directly related to the general business operations of Centene. Plaintiffs therefore satisfy the second prong of the administrative-exemption test.

> b. *In The Alternative, Plaintiffs' Work Was Directly Related To The General Business Operations Of Centene's Customer*

Even if the district court had not mischaracterized Centene's business and had correctly determined that Centene's primary "product" was the administration of Medicaid claims, plaintiffs nonetheless satisfy the second prong of the administrative-exemption test. That is because their work was directly related to the general business operations of Centene's *customer*, the State of Texas. *See* 29 C.F.R. §§ 541.200(a); 541.201(c). The district court gave short shrift to the contention that employees performing administrative functions for their employer's customers stand in the shoes of those performing administrative functions directly for their employer—notwithstanding the regulation's clear directive to the contrary. The deci-

sions of this Court and other federal courts compel the conclusion that, at a minimum, plaintiffs performed administrative duties with respect to Centene's customer.

In *Zannikos* v. *Oil Inspections (U.S.A.), Inc.*, 605 Fed. Appx. 349 (2015) (per curiam) (unpublished), this Court considered—and rejected—the argument that "employees who produce the precise service offered to customers by their employer are engaged in production," regardless of whether the employees' work is directly related to the general business operations of their employer's customers.    *Id.* at 353.    The Court pointed out that "[m]any—perhaps most—employees whose primary duties directly relate to the management of customers perform the precise services offered by their employers," such as "tax experts, financial consultants, and management consultants."  *Id.* at 353-354.  If those employees were to fall outside the administrative exemption, the Court cogently observed, it would "conflict[] with Section 541.201(c), which explicitly states that such employees satisfy the second element of the exemption."  *Id.*  While the Court's decision in *Zannikos* was unpublished, its reasoning is persuasive, and the Court should follow it here.[8]

---

[8] Without citing any authority, the district court implied that, for an employee to perform exempt administrative duties, there must be an employee within the same company tasked primarily with nonexempt "production" responsibilities.  *See* ROA.4514 (stating that, "[i]f [p]laintiffs are administrative employees, it is difficult to conceptualize who within the Centene organiza-

Other courts have applied the same logic to employees in comparable situations. For example, in *Roe-Midgett*, *supra*, the Seventh Circuit considered a company that provided external claims-processing services to insurance companies—analogous to what the district court thought Centene did. *See* 512 F.3d at 872. The *Roe-Midgett* plaintiffs made the same argument that plaintiffs in this case advanced below: namely, that "[the employer] 'produces' claims-processing services (though not the underlying policies) and therefore [the employees at issue] are essentially responsible for 'producing' [the employer's] 'product.'" *Id.* The Seventh Circuit correctly recognized that this point was "immaterial," because "administrative operations of a business may be those of the employer *or* the employer's customers." *Id.* (internal quotation marks omitted). Because the employer's customers were "insurance companies in the business of selling policies," the "employees who process claims against those policies are performing an administrative func-

---

tion is *not* an administrative employee"). The relevant regulations, however, nowhere state (or even imply) that it would be impermissible for an entire business to be composed of administrative employees. Instead, they specifically envision employees such as tax preparers, financial consultants, and management consultants satisfying the second prong of the administrative-exemption test—even though they create the "product" of tax firms, financial institutions, and management consulting firms. *See* 29 C.F.R. § 541.203. It would thus be of no moment if *every single employee* within Centene qualified as administrative.

tion for [their employer's] customers (*i.e.*, a task that administers the policies 'produced' by the insurers)." *Id.*

A West Virginia district court reached the same conclusion in a matter involving an outside company hired by the State of West Virginia for the purpose of processing its workers' compensation insurance claims. *See Withrow* v. *Sedgwick Claims Management Services, Inc.*, 841 F. Supp. 2d 972, 980 (S.D. W. Va. 2012). The court determined that the primary duty of the employees at issue—claims processors—was directly related to the general business operations of their employer's customer, the State of West Virginia. *See id.* The court reasoned that "[the employer's] customer, the State of West Virginia, provided workers' compensation insurance to claimants, and the plaintiffs administered these claims, rather than produced or sold a product." *Id.* The facts in this case dictate the same result.

The district court distinguished *Roe-Midgett* and *Withrow* on the ground that "those cases involved classic insurance claims adjusters." ROA.4516. As explained above, however, cases involving "classic insurance claims adjusters" have obvious persuasive value in considering the application of the same regulations to Centene, which provides its customers with a similar product, and plaintiffs, who perform a similar role. The district court offered no other reason for refusing to consider *Roe-Midgett* and *Withrow*.

In fact, the logic of *Roe-Midgett* and *Withrow* applies with full force in this case. Particularly in light of this Court's recent decision in *Zannikos*, even if this Court were to adopt the district court's view that utilization review is the "product" Centene provides, it is clear that utilization review nurses were performing an administrative function on behalf of Centene's customer, the State of Texas. On that alternative basis, therefore, plaintiffs also satisfy the second prong of the administrative-exemption test.

### 3. *Plaintiffs' Primary Duty Included The Exercise Of Discretion And Independent Judgment With Respect To Matters Of Significance*

The third and final prong of the administrative-exemption test requires that the exempt employee's "primary duty include[] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). As this Court has observed, "[t]he exercise of discretion and independent judgment necessitates consideration and evaluation of alternative courses of conduct and taking action or making a decision after the various possibilities have been considered." *Lott* v. *Howard Wilson Chrysler-Plymouth*, 203 F.3d 326, 331 (2000). And as the regulations explain, "[t]he term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). Factors to consider when evaluating whether an employee satisfies that requirement include "whether the employee has authority to formulate, affect, interpret, or im-

plement management policies or operating practices; . . . whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; . . . [and] whether the employee has authority to negotiate and bind the company on significant matters." 29 C.F.R. § 541.202(b).

Employees who exercise discretion and independent judgment typically have some leeway to "make an independent choice, free from immediate direction or supervision," but they can satisfy that requirement "even if their decisions or recommendations are reviewed at a higher level." 29 C.F.R. § 541.202(c). This Court and others have repeatedly reiterated that the exercise of final decisionmaking authority is not required. *See, e.g., Cheatham*, 465 F.3d at 585-586 (determining that insurance adjusters who "in seeking approval . . . were expected to make a recommendation based on their experience and knowledge" exercised discretion and independent judgment); *Lott*, 203 F.3d at 331 (stating that "[f]inal decision making authority over matters of consequence is unnecessary"); *Talbert* v. *American Risk Insurance Co.*, 405 Fed. Appx. 848, 854 (5th Cir. 2010) (per curiam) (unpublished) (noting that "[t]he fact that [plaintiff] was not able to settle claims on his own, but had to seek approval from his supervisor, does not preclude his classifica-

tion as an exempt administrative employee"); *Roe-Midgett*, 512 F.3d at 874; *Withrow*, 841 F. Supp. 2d at 981.

Further, the mere fact that employees "must consult with manuals or guidelines" does not "preclude their exercise of discretion and independent judgment." *Cheatham*, 465 F.3d at 585-586; *accord, e.g.*, *Roe-Midgett*, 512 F.3d at 875; *In re Farmers Insurance Exchange*, 481 F.3d 1119, 1130 (9th Cir. 2007); *McAllister* v. *Transamerica Occidental Life Insurance Co.*, 325 F.3d 997, 1001 (8th Cir. 2003). The Department of Labor's regulations specifically recognize that "manuals, guidelines or other established procedures containing or relating to highly technical, scientific, . . . or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge" can provide useful guidance in addressing difficult decisions. 29 C.F.R. § 541.704.

Indeed, in *Cheatham*, this Court specifically considered whether insurance claims adjusters' use of a "system of practices and procedures" that required the adjusters to "adhere to a liability matrix," use "computer software," and follow a manual in settling claims, negated their exercise of independent judgment. 465 F.3d at 585-586. The Court concluded it did not. Because the *Cheatham* plaintiffs, despite their use of computer software and manuals, "were expected to make a recommendation based on their experience and knowledge of the case and to explain their reasons for recommen-

dation," the Court determined that their primary duty involved the exercise of independent judgment. *Id.*

Moreover, the applicable regulation requires only that, for an employee to be exempt, the employee's primary duty must "include" the exercise of discretion and independent judgment; the regulation "does not specify how frequently discretion need be exercised." *Robinson-Smith*, 590 F.3d at 894; *accord, e.g.*, *McAllister*, 325 F.3d at 1002.  For example, in *Robinson-Smith*, the District of Columbia Circuit determined that, even assuming that the "vast majority" of a certain type of insurance claims adjusters' work consisted of making decisions in strict accordance with the standards laid out by their employer, the fact that those employees also had the ability to settle small claims was sufficient for their primary duty to "include" the exercise of discretion and independent judgment.  590 F.3d at 894.

Plaintiffs plainly satisfy the third prong of the administrative-exemption test.[9]  Plaintiffs' primary duty—determining whether services requested by health-care providers on behalf of plan members are medically necessary and appropriate and then determining whether the health plan will cover the services—involved the exercise of discretion and independent

---

[9] Although the district court did not reach the third prong of the test in light of its determination on the second prong, this Court may address it because the facts relevant to that prong are undisputed. *See Bricklayers*, 512 F.2d at 1023.

judgment with respect to matters of significance. Plaintiffs exercised discretion and independent judgment in determining what clinical information about the member was pertinent to the coverage determination and, when necessary, identifying missing information and collecting it from the member's health-care provider, *see* ROA.2138, 2347-2349, 3253-3254, 3346; analyzing the collected information to determine whether the requested treatment was medically necessary and appropriate and would therefore be covered, *see* ROA.2136-2137, 3254; deciding whether, if a service was not medically necessary, an alternative treatment option existed that could be suggested to the member's medical provider, *see* ROA.2139, 2142, 2344, 2353; and, if it were determined that a service were not medically necessary and coverage should be denied, providing an explanation of that recommendation to the medical director, *see* 2139, 2249-2293.

In addition, it is undisputed that plaintiffs worked with little supervision or oversight. Centene's utilization review nurses were provided with a certain number of authorization requests to process within a given time frame, but they were free to spend as much or as little time on each request as they deemed necessary, depending on the amount of information associated with the coverage determination, its level of difficulty, and other factors. *See* ROA.2138-2139, 2355, 3256. Many of the nurses worked from home on a

regular basis.  *See* ROA.2139, 3253-3254.  And nurses routinely traveled on their own to hospitals to gather information onsite.  *See id.*

The mere fact plaintiffs did not have final decisionmaking authority in one respect—namely, with regard to the *denial* of claims—is not dispositive of whether they exercised discretion and independent judgment.  *See, e.g.*, *Lott*, 203 F.3d at 331.  Indeed, the majority of courts to have determined that insurance claims adjusters are exempt administrative professionals—including this one—have recognized that the adjusters did not have final decisionmaking authority in at least one respect.  *See, e.g.*, *Cheatham*, 465 F.3d at 585-586; *Talbert*, 405 Fed. Appx. at 854; *Robinson-Smith*, 590 F.3d at 894-895; *Roe-Midgett*, 512 F.3d at 874.  The salient point is that, in many respects, plaintiffs' duties plainly did "include" the exercise of discretion and independent judgment.  *See Robinson-Smith*, 590 F.3d at 894-895.

Nor does the fact that plaintiffs unquestionably used manuals and guidelines to assist in their decisionmaking process negate the fact that they exercised discretion and independent judgment.  The Department of Labor's regulations specifically acknowledge that "[t]he use of  .  .  .  guidelines .  .  . relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption." 29 C.F.R. § 541.704.  Moreover, while Texas law mandates the use of "medi-

cally acceptable screening criteria" in utilization review, it also requires coverage determinations to "tak[e] into account special circumstances . . . that may require deviation from the norm stated in the screening criteria"—and further requires the "screening criteria" to be "flexible enough to allow a deviation from the norm when justified on a case-by-case basis." Tex. Ins. Code Ann. § 4201.153.

Plaintiffs were thus prohibited from simply applying the guidelines in a mechanical manner; rather, they had to exercise their judgment as medical professionals in using the guidelines. And once again, numerous federal courts—including this one—have found insurance claims adjusters to be administratively exempt while recognizing that those employees used manuals and/or computer programs to facilitate their decisions about coverage. *See, e.g.*, *Cheatham*, 465 F.3d at 585; *Roe-Midgett*, 512 F.3d at 875; *Farmers*, 481 F.3d at 1130.

Finally on this score, the discretion and independent judgment that plaintiffs exercised involved matters of significance to Centene (and to the State of Texas). Simply put, plaintiffs recommended whether Centene should cover requested services—a critical function, if not the most critical function, of administering a health plan. *See* ROA.2138. Although plaintiffs did not make final decisions about denials, they were able to commit the company to pay for approved services without supervisory oversight or per-

mission. *See* ROA.2136-2137. Again, courts have recognized that such decisions involve matters of significance to insurance companies. *See, e.g.*, *Robinson-Smith*, 590 F.3d at 895; *Roe-Midgett*, 512 F.3d at 874. This Court should follow suit.

*    *    *    *    *

Because plaintiffs satisfy all three prongs of the administrative exemption, they are exempt from the FLSA's overtime requirements. The district court erred by holding to the contrary, and its judgment should therefore be reversed.

### B.    In The Alternative, Plaintiffs Qualify For The Professional Exemption From The FLSA's Overtime Requirement

Should this Court conclude that the district court erred by holding that plaintiffs do not qualify for the administrative exemption, that would be a sufficient basis to reverse the judgment below and require the entry of judgment in Centene's favor. In the alternative, however, the Court should reverse the judgment below because the district court also erred by holding that plaintiffs do not qualify for the professional exemption.

The Department of Labor has established a two-part test for the category of professionals at issue here—so-called "learned professionals." *First*, they must meet the same salary test as exempt administrative employees. 29 C.F.R. § 541.300(a)(1). As discussed above, plaintiffs indisputably do. *See* p. 28-29, *supra*.

*Second*, as is relevant here, such employees must perform, as their primary duty, work "[r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. §§ 541.300(a)(2)(i), 541.301(a). The regulation breaks down this prong of the test into three elements: "(1) [t]he employee must perform work requiring advanced knowledge; (2) [t]he advanced knowledge must be in a field of science or learning; and (3) [t]he advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a).

The district court focused on the third element, concluding that plaintiffs' work did not require the type of advanced knowledge "customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a). That conclusion was incorrect. Plaintiffs in fact satisfy all of the elements of the test for learned professionals, and the district court's contrary holding should be reversed.

### 1. Plaintiffs Performed Work Requiring The Use Of Advanced Knowledge

As the applicable regulation explains, work requiring advanced knowledge is "predominantly intellectual in character" and "includes . . . the consistent exercise of discretion and judgment." 29 C.F.R. § 541.301(b). The regulation points out that "[a]n employee who performs work requiring

advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances." *Id.*

As the explanation of plaintiffs' duties above demonstrates, plaintiffs' work was predominantly intellectual in character and included the exercise of discretion and independent judgment.  Other federal courts have determined that individuals who performed materially identical or similar tasks, such as utilization review nurses in the workers' compensation context or nurse case managers, satisfied that standard.  For example, in *Withrow*, the court concluded that, "[a]s a utilization review nurse, [plaintiff] used her advanced knowledge to consistently exercise judgment in determining whether a treatment requested by a claimant was related to the compensable injury." 841 F. Supp. 2d at 987.  Similarly, a California district court determined that a nurse employed as a "field case manager" for patients receiving medical treatment as a result of workers' compensation claims used advanced knowledge to perform her primary duty, which consisted of "communicating with doctors, patients and claims adjustors in order to understand the patients' conditions, determine what medical care was being provided and evaluate whether it was appropriate." *Rieve* v. *Coventry Health Care, Inc.*, 870 F. Supp. 2d 856, 863-866 (C.D. Cal. 2012).  And a Maryland district court reached the same conclusion with respect to a nurse employed as a "field medical case manager" whose responsibilities were "almost identical to those

of the plaintiff in *Rieve*" and included "reviewing the physician's or thera-pist[']s diagnosis." *Williams* v. *GENEX Services, Inc.*, Civ. No. 13-1942, 2014 WL 4388360, at *3, *7 (D. Md. Sept. 4, 2014) (emphasis and internal quotation marks omitted). Indeed, as one of those courts observed, we are "not aware of any case . . . in which a case manager . . . has not been deemed a professional exempt from FLSA coverage." *Rieve*, 870 F. Supp. 2d at 864.

Plaintiffs' primary task was to determine whether services requested by health-care providers on behalf of plan members were medically neces-sary and appropriate—and then to determine whether the health plan would cover the services. That task was comparable to the tasks performed by the nurses in the foregoing cases, which uniformly hold that the employees' du-ties required the use of advanced knowledge. The same conclusion is appro-priate here.

### 2. *Plaintiffs' Advanced Knowledge Was In A Field Of Science Or Learning*

There can be no serious dispute as to whether plaintiffs' advanced knowledge was in a "field of science or learning." 29 C.F.R. § 541.301(c). In-deed, "medicine" is specifically identified in the regulation as one of the "tra-ditional professions" intended to be included within the scope of this re-quirement. *Id.* Although plaintiffs were not directly responsible for patient care, their responsibilities included gathering information about patients and

analyzing, based on that information and using their training and experience as nurses, whether a requested service was medically necessary and appropriate.    The uncontested facts demonstrate that plaintiffs' advanced knowledge was in "a field of science or learning":  medicine.

### 3.    *Plaintiffs' Advanced Knowledge Was Of A Type Customarily Acquired By A Prolonged Course Of Specialized Intellectual Instruction*

Finally, the advanced knowledge plaintiffs used was of a type customarily acquired through a "prolonged course of specialized intellectual instruction."  29 C.F.R. § 541.301(d).  That element of the test "restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession."  *Id.*  Although an "appropriate academic degree" can be evidence of the requisite specialized training, so can a "combination of work experience and intellectual instruction."  *Id.*  This Court has relied on work experience, as well as formal academic training, in concluding that this element of the learned-professional test is satisfied.  *See, e.g.*, *Owsley* v. *San Antonio Independent School District*, 187 F.3d 521, 524 n.3, 525 (5th Cir. 1999) (concluding that academic trainers satisfied element based on college degree in any field, 15 hours of specialized coursework, and apprenticeship training); *Paul* v. *Petroleum Equipment Tools Co.*, 708 F.2d 168, 173 (5th Cir. 1983) (concluding that airline pilot satisfied element based on non-college course of instruction and practical flying requirements).

At Centene, a utilization review nurse is required to possess at least two years of clinical nursing experience and to be licensed as a registered nurse, a licensed practical nurse, or a licensed vocational nurse. ROA.4503. In the State of Texas, a registered nurse must complete an educational program of between two and four years in length and pass a licensing examination. *Id.* Similarly, a licensed vocational nurse must complete a one-year educational program, which includes both classroom and clinical components, and pass a licensing examination. *Id.* The standard prerequisites for becoming a utilization review nurse, therefore, are a nursing license obtained through a required educational program *and* at least two years of specialized experience.

Despite those requirements, the district court determined that plaintiffs did not satisfy this element of the learned-professional test. It based that determination largely on a regulation instructing that "[r]egistered nurses . . . *generally* meet the duties requirements for the learned professional exemption," whereas "[l]icensed practical nurses . . . *generally* do not qualify as exempt . . . because possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations." 29 C.F.R. § 541.301(e)(2) (emphases added). Instead of recognizing that this regulation was intended to be a *guideline* applied to those persons who are actually *employed* as licensed practical nurses (or their Texas equiv-

alent, licensed vocational nurses, *see* p. 12 n.2, *supra*), the district court erroneously assumed that, because Centene required utilization review nurses to be licensed, at the least, as licensed practical nurses or licensed vocational nurses, *all* utilization review nurses should be treated, for the purpose of the learned-professional exemption, as if their "occupation" was that of an licensed practical nurse or licensed vocational nurse.

That treatment is simply incorrect. It is undisputed that no plaintiff was employed by Centene as a licensed practical nurse or a licensed vocational nurse (or, for that matter, as a registered nurse). ROA.2135-2136, 3253-3254. Rather, plaintiffs' "occupation" was utilization review nurse. The requirements for that position were *not* equivalent to those for a registered nurse, licensed practical nurse, or licensed vocational nurse; rather, that position required at least two years of relevant, specialized experience *in addition to* the educational requirements for one of the other positions.[10]

---

[10] Nor are plaintiffs comparable to paramedics or emergency medical technicians, whom this Court has previously held possessed insufficient educational requirements to qualify as learned professionals. *See Vela* v. *City of Houston*, 276 F.3d 659, 675 (5th Cir. 2001). The plaintiffs in *Vela* were required to complete, at most, "880 hours of specialized training in didactic courses, clinical experience, and field internship." *Id.* In contrast, plaintiffs here, at the very least, were required to complete "a minimum of 1,398 clock hours" of study, *plus at least two years of specialized experience. See* ROA.4503. As this Court noted in *Vela*, the occupations at issue there differ from medical occupations with more "rigorous" educational requirements and more "extensive" educational backgrounds. *See* 276 F.3d at 675-676.

As noted above, this Court has recognized that work experience can support the conclusion that this element of the learned-professional test is satisfied.  *See Owsley*, 187 F.3d at 525; *Paul*, 708 F.2d at 173.  The district court should have followed suit here, and it erred by discounting clinical work experience and equating utilization review nurses with licensed practical or vocational nurses.

As a result, plaintiffs satisfy all of the requirements for exemption from the FLSA's overtime requirements as learned professionals.  The district court erred by holding that plaintiffs do not qualify either for the professional exemption or for the administrative exemption.  This Court should therefore reverse the judgment in plaintiffs' favor.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

s/ Kannon K. Shanmugam

MICHAEL J. GOLDEN
BOULETTE GOLDEN & MARIN LLP
*2801 Via Fortuna, Suite 530*
*Austin, TX 78746*

KANNON K. SHANMUGAM
MATTHEW B. NICHOLSON
LESLIE C. MAHAFFEY
WILLIAMS & CONNOLLY LLP
*725 Twelfth Street, N.W.*
*Washington, DC 20005*
*(202) 434-5000*

OCTOBER 21, 2015

## CERTIFICATE OF SERVICE

I, Kannon K. Shanmugam, counsel for appellant Centene Company of Texas, L.P., and a member of the Bar of this Court, certify that, on October 21, 2015, a copy of the attached Brief of Appellant Centene Company of Texas, L.P., was filed with the Clerk through the Court's electronic filing system. I further certify that all parties required to be served have been served.

s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, counsel for appellant Centene Company of Texas, L.P., and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and Fifth Circuit Rule 32.3, that the attached Brief of Appellant Centene Company of Texas, L.P., is proportionately spaced, has a typeface of 14 points or more, and contains 12,341 words.

s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

OCTOBER 21, 2015